| | |
|---|---|
| CARLA LITTLE, <br><br> Plaintiff, <br><br> v. <br><br> ILLINOIS DEPARTMENT OF PUBLIC HEALTH, <br><br> Defendant. | No. 17 CV 4466 <br><br> Judge Manish S. Shah |

## MEMORANDUM OPINION AND ORDER

Plaintiff Carla Little, an African American woman in her 50s, held a number of positions at the Illinois Department of Public Health. After a department reorganization, Little began working for a new supervisor. Among other things, the new supervisor delegated Little's work assignments to other employees, increased oversight of her work, and began monitoring her attendance records. Little also received a number of disciplinary sanctions. Meanwhile, other department employees—some of whom were male, white, or in their 30s—received promotions to positions that Little says she was both interested in and better qualified for. Little filed a series of complaints, including an EEOC charge, based on perceived discrimination on the basis of her age, sex, and race. The EEOC issued her a right-to-sue letter, and Little sued for discrimination and retaliation under Title VII and the Age Discrimination in Employment Act. The department now moves for summary judgment on all claims. For the reasons discussed below, its motion is granted.

## I.     Legal Standards

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). I construe all facts and draw all inferences in favor of the nonmoving party. *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 377–78 (7th Cir. 2020).

## II.    Local Rule 56.1 and Evidentiary Issues

Local Rule 56.1 "aims to make summary-judgment decisionmaking manageable for courts." *Kreg Therapeutics, Inc. v. VitalGlo, Inc.*, 919 F.3d 405, 414 (7th Cir. 2019). To that end, the rule requires the moving party to file a statement of facts that it believes entitle that party to judgment as a matter of law. *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014); N.D. Ill. Local R. 56.1(a)(3). The nonmoving party must file a response to that statement, and may provide a separate statement of additional facts. *Petty*, 754 F.3d at 420; N.D. Ill. Local R. 56.1(b)(3)(B), (C).

If the responding party disagrees with the other party's fact, it must cite specific parts of the record disputing that fact. *Petty*, 754 F.3d at 420. Failure to properly controvert a fact results in its admission. *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). Facts that a party raises in a Local Rule 56.1 response that do not controvert the assertion and that are not included in the party's statement

of additional facts are stricken. I also disregard legal arguments in the statement of facts. *See Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006).

Both sides violated this rule in their filings. Both parties respond to the other's facts with additional facts. All additional facts asserted in response to the other party's facts are stricken. *See* [79] ¶¶ 6, 11, 14, 19, 38, 45, 53, 61; [95] ¶¶ 6, 16, 26, 28, 34.[1] Little also flouts the local rule by relying on facts throughout her response brief that are not in her Rule 56.1 statement. *See* [80] at 4, 7–8, 10–12, 14, 20–23. "[P]roviding additional facts in one's responsive memorandum is insufficient to put those facts before the Court." *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000); *see also Igasaki v. Ill. Dep't of Fin. & Prof'l Regs.*, No. 15-CV-03693, 2018 WL 4699791, at *2 (N.D. Ill. Sept. 30, 2018) ("Citing directly to new facts in the opposition brief is a clear violation of Local Rule 56.1."). Little also cites directly to the record throughout her brief, rather than to the 56.1 statements—another rule violation. *See Mervyn v. Nelson Westerberg, Inc.*, 142 F.Supp.3d 663, 664–65 (N.D. Ill. 2015) (collecting cases). It is "essential to the court's proper consideration" of a party's arguments for the party to reference "the Local Rule 56.1 statements and responses," and not "the record materials themselves." *Id.* Based on Little's multiple rule violations, I disregard all of these facts. But for the sake of completeness and to assure Little that summary

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from Little's response to IDPH's Rule 56.1 statement, [79], and IDPH's responses to Little's statement of additional facts, [95], where both the asserted fact and the opposing party's response are set forth in one document.

judgment was not solely the result of a technicality, I consider some of Little's additional facts presented in her brief as noted below.

Little's additional statement of facts and the corresponding exhibits also suffer from several evidentiary defects. Evidence supporting or opposing summary judgment must be admissible if offered at trial, except that depositions and other written testimony can substitute for live testimony. *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 460 (7th Cir. 2014). I may consider "properly authenticated and admissible documents or exhibits" in a summary-judgment proceeding. *Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir. 2000). Under Federal Rule of Evidence 901(a), to authenticate an item of evidence, the proponent "must produce evidence sufficient to support a finding that the item is what the proponent claims it is." *United States v. Jackson*, 940 F.3d 347, 351 (7th Cir. 2019) (quoting Fed. R. Evid. 901(a)).

In Little's response to IDPH's Rule 56.1 statement, she relies on several attached exhibits that she has not laid a foundation for or authenticated. These include her performance reviews, [79-2] at 2–16; [79-3] at 1–5; [95] ¶ 9, 11; text messages and emails she sent to various officials complaining of race and sex discrimination, [79-9] at 1–10; [79-10] at 1–26; [95] ¶ 20; a complaint that she filed with the Office of Executive Inspector General, [79-4] at 3–6; [95] ¶ 20; an internal letter she filed with IDPH, [79-4] at 27–32; [95] ¶ 20; and a complaint that she filed with the Attorney General's Office, [79-4] at 20–26; [95] ¶ 20.

I disregard the screenshots of text messages and emails, as well as the letter Little sent within IDPH. Little cites to no supporting affidavit or evidence in her

deposition or elsewhere in the record that could serve as authentication for these documents. Nevertheless, the performance evaluations are admitted because, although they lack foundation, IDPH does not dispute that Little received positive performance reviews from 2012 to 2015. [95] ¶¶ 9, 11. Likewise, IDPH does not dispute that Little complained to the OEIG and AG's Office. While Little has the burden to show authenticity, IDPH is also a state agency and would presumably know if documents from another state agency were inauthentic. IDPH identifies no indicia of inauthenticity on the documents. They are stamped and appear to be accurate copies of state business records. The OEIG and AG complaints are admitted despite Little's lack of compliance with the threshold foundation and authenticity requirements.

Several of Little's facts are also inadmissible hearsay. For example, Little learned that Eric Rayman monitored the badge swipes of other African American employees because another employee told her what Rayman was doing. [95] ¶ 26. Little relies on this to assert that Rayman, did, in fact, discriminatorily monitor only certain employees. That is inadmissible hearsay and cannot be considered for its truth. The same fact asserts that Rayman told Little's supervisor, Gina Swehla, to monitor Little's swipes, and Swehla did so—I consider that only for the effect on Swehla, the listener. Other facts include hearsay or reliance on insufficiently authenticated documents as well, *see, e.g.*, [95] ¶¶ 30, 36, but Little does not rely on them in her argument so I need not resolve the department's objections.

## III.    Background

### A.    Little's Background

In 2004 Carla Little, an African American woman in her 50s, joined the Illinois Department of Public Health as a laboratory research scientist. [79] ¶ 5. Little had a Ph.D. in molecular biology, two bachelor's degrees, and certifications in emergency incident management and homeland security exercise evaluation training. [95] ¶ 2. A few years after she joined the department, she moved to its Office of Preparedness and Response as the Cities Readiness Initiative/Strategic National Stockpile Coordinator. [79] ¶ 6; [95] ¶ 1.[2] Little's primary responsibility was to manage a supply of drugs and medical devices to be used in a national emergency, a role that required her to work with the federal government. [79] ¶ 13.

Little's role was classified as a Public Service Administrator. [95] ¶ 1. She reported to the Division Chief, a position classified as a Senior Public Service Administrator; the Division Chief reported to the Deputy Director, who reported to the Public Health Director. [95] ¶ 1.

### B.    The September 2015 Reorganization

From 2010 to 2015, Little reported to Deputy Director Winfred Rawls, an African American man. [79] ¶ 7. In September 2015, Rawls announced a new

---

[2] Little disputes that she was a Coordinator in 2007 because her title changed to Manager in 2010, then back to Coordinator in 2015. [79] ¶ 6. But Little does not properly controvert IDPH's assertion that her title in 2007 was Coordinator—IDPH clearly cabins its fact to Little's title in 2007, irrespective of what came later, and the record supports IDPH's assertion. [62-2] 19:1–5, 81:3:17. Although the record also supports Little's title changes in 2010 and 2015, I disregard new facts asserted in response to IDPH's facts for the reasons noted above.

reporting structure to bring OPR in line with a structure that the Central Management Services, Bureau of Personnel had approved. [79] ¶ 8. Under the new structure, Little and Mark Vassmer both reported to Gina Swehla, Division Chief for Disaster Planning and Readiness, a woman in her 50s. [79] ¶¶ 8, 10; [95] ¶ 12.[3] At the same time, Little's title changed to Cities Readiness Initiative/Strategic National Stockpile Coordinator. [79] ¶ 41. Swehla had become Division Chief—a Senior Public Serve Administrator Position—a few months earlier, when she applied, interviewed, and was promoted to that position, which had been vacant. [79] ¶ 11; [95] ¶ 3. Little worked out of IDPH's Chicago office, and Swehla worked out of the Springfield office. [79] ¶ 12.

### C.    Little's Working Environment

Swehla considered Little to be a hard worker; however, she felt that Little could not handle her workload. [79] ¶ 20; [95] ¶ 7. Little missed deadlines set by Swehla, Rawls, or the federal government, and sometimes failed to provide information to others on time, causing the department to miss deadlines. [79] ¶ 19. IDPH's federal partners complained about the quality of Little's work, as well as her working style. [79] ¶ 21–22.[4] Christine Kosmos, a director at the Centers for Disease

---

[3] There is some discrepancy about whether Swehla began supervising Little in July or September. Little does not dispute IDPH's assertion that she began reporting to Swehla in September 2015, *see* [79] ¶ 8, but IDPH does not dispute Little's assertion that Swehla began supervising her in July. [95] ¶ 12. According to the record, Swehla was hired to be the Division Chief for Disaster Planning and Readiness in July, but the department announced in September that Little would be reporting to Swehla. [62-5] at 4. And Little testified that she began reporting to Swehla in September. [62-2] 105:15–17, 107:12–22.

[4] Little disagrees with this fact because the department does not date the CDC's complaint about her work. The absence of a date does not controvert the fact of the complaint.

Control and Prevention, told Rawls that her staff could not work with Little because Little had issues communicating, and she was rude and unprofessional. [79] ¶ 22. Little felt that her coworkers considered her argumentative and aggressive. [79] ¶ 39.

Shortly after Swehla began supervising Little, Swehla started monitoring and sometimes taking over meetings that Little was supposed to lead. [79] ¶¶ 36, 46. Swehla permitted Little to schedule meetings, but if Swehla could not attend, she asked Little to reschedule. [79] ¶¶ 42–43. Swehla also took some work assignments away from Little, such as preparation of a medical countermeasure assessment and a training exercise; sometimes Swehla gave assignments back at the last minute. [79] ¶ 44, 46. On one occasion, Swehla scheduled a meeting that she could not attend, so Jennifer Reid tried to lead the meeting instead, but Reid had to rely on Little for the specifics. [79] ¶ 45.

At the meetings themselves, Little's colleagues rejected her ideas or preferred other's ideas to hers, despite Little's expertise in medical countermeasures. [79] ¶¶ 37–38. No one ever explicitly called one of Little's ideas terrible, but Little's colleagues afforded more deference to ideas proposed by Anu Meka and Matthew Ringenberg, a white man. [79] ¶¶ 48, 55, 59–60. Little also felt that her colleagues did not allow her to speak at the meetings, although no one ever prohibited her from speaking. [79] ¶¶ 37–38. When Little called in to meetings in Springfield from Chicago, her coworkers put Little on hold while she was talking, and before the meeting ended. [79] ¶ 40.

Other employees also supervised full-time staff, while Little supervised only interns; employees with staff included Tricia Patterson, a white woman, Meka, a woman, and Vassmer, a white man. [79] ¶¶ 14, 53–55, 58; [95] ¶ 5.[5] For example, Joe Ramos, an Asian man who was 40 or younger, reported directly to Meka. [79] ¶ 61. Little never asked Swehla to hire another full-time staff member to help her. [79] ¶ 14; [95] ¶ 6.

Little also alleges she was subject to extra scrutiny. Eric Rayman, IDPH's chief of staff, checked Little's security badge swipes to see what times she arrived and left work, and also checked her computer log to see what time she logged in. [79] ¶¶ 33–34. Rayman told Swehla to monitor Little's time logs as well. [95] ¶ 26. Little does not dispute that it is permissible for IDPH to check when an employee checks in and out of work. [79] ¶ 32.

Finally, Little alleges that she suffered a series of administrative indignities: between January and April of 2015, Little was not timely reimbursed by her coworker Deborah Usherwood for her travel expenses. [79] ¶¶ 24, 47; [95] ¶ 24. And Swehla did not conduct Little's annual performance review. [95] ¶ 12.

Swehla never noticed African American employees being treated less favorably than members of other races. [79] ¶ 18. No one ever said or wrote a racial slur to Little, and Swehla never commented on Little's age or sex. [79] ¶¶ 48–49. No supervisor ever said anything negative about Little's sex. [79] ¶ 50.

---

[5] IDPH disputes that Ashley Theole reported to Vassmer, without citing to any specific testimony. The record supports Little's assertion. Little testified that "Ashley's supervisor was Mark Vassmer." [62-2] 45:11–17. The fact is admitted.

### D. Little's Job Performance and Disciplinary History

On her yearly evaluations between 2012 and 2015, Little received Exceeds Expectations on three to seven out of eight possible categories, and Meets Expectations on almost all of the other categories. [95] ¶¶ 9, 11.

In January 2014, the department suspended Little for one or two days without pay. [79] ¶ 31. In June 2015, Michelle Gentry-Wiseman, who Little did not know, told Rawls that he should reprimand Little for the way she acted in a meeting, and Rawls subsequently disciplined Little for acting inappropriately at the meeting. [79] ¶ 35; [95] ¶ 25.

The CDC filed a complaint against Little for failing to complete an Illinois point-of-contact list on time. [79] ¶ 30. As a result, IDPH scheduled a predisciplinary hearing for Little in Springfield in September 2015. [79] ¶ 30. Before the hearing, Eric Rayman, the department's chief of staff, went to Little's office with a statement of charges for the hearing, which included infractions dating back to January 2014, including travel policy violations, timesheet violations, and missing deadlines. [79] ¶ 31; [95] ¶ 27. Little was suspended for two days in November, but she appealed and the suspension was overturned. [95] ¶ 27.

In August 2016, Swehla issued Little a written reprimand that included five violations. [79] ¶ 24. Little failed to report for a scheduled training; didn't notify Swehla before changing her travel plans; and ignored three written directives from Swehla to complete certain tasks by designated dates. [79] ¶ 24. A few months later, Rawls issued Little a written reprimand for unprofessional conduct, insubordination,

disruptive conduct, and conduct unbecoming of a state employee. [79] ¶ 25. The reprimand related to Little talking over colleagues during meetings and conference calls. [79] ¶ 25. In one case, Little disapproved of a training method, and criticized the training and her colleagues. [79] ¶ 25.

At some point, Little appeared as a guest on a TV show called "Community Forum." [79] ¶ 26. Little did not clarify during the interview that she was appearing in her personal capacity. [79] ¶ 26.[6] Little said on the show that if IDPH employees "had the opportunity," they would "take [her] outside" in Springfield and "rape [her] butt naked and hang [her]." [79] ¶ 26. She added, "I think they would do it." [79] ¶ 26. Further, Little stated that her supervisor was "a crony of this new administration" and was "not qualified for the position." [79] ¶ 26. As a result, Rawls consulted with the director's office and decided to suspend Little for three days. [79] ¶¶ 26, 28. Swehla handed down the sanction. [79] ¶ 28.

Little does not dispute that, under department policy, employees are required to carry out the directives of their supervisors or risk discipline. [79] ¶ 65. Likewise, only IDPH's director (or people the director approves to speak on his or her behalf) is authorized to speak for the department. [79] ¶¶ 66–67.

---

[6] Little disputes this fact, because she says she notified the department that she would appear on the show in her personal capacity. [79] ¶ 15. Notifying the department is not the same as notifying the viewing audience, so Little's evidence does not controvert the department's assertion. The fact is admitted.

### E.    Promotions at IDPH

To apply for promotions, employees typically filled out a "CMS" form, although some appointed positions were not posted as vacant. [79] ¶ 15.[7] In 2012, Little applied to be an Assistant Lab Manager, but the job went to Matthew Charles, a white man who Little perceived to be in his 40s. [95] ¶ 10. After 2012, Little never applied for another promotion. [79] ¶ 15; [95] ¶ 18. At some point in the few years before 2019, Little told Rawls that she was interested in the job of Communicable Disease Section Chief. [95] ¶ 16. Little did not tell Swehla that she was interested in a higher position, or, specifically, that she was interested in becoming a Senior Public Service Administrator, and Little never filled out an application for that position. [79] ¶ 15–16. According to Swehla, there were no vacancies for positions higher than Little's at OPR between July 2015 and March 2017. [79] ¶ 17.

Other employees received promotions between 2016 and 2019. The department promoted Judy Kaurauf, a white woman who does not have a Ph.D., to Communicable Disease Section Chief. [79] ¶ 64; [95] ¶ 16–17. It promoted Molly Lamb, a white woman in her 40s, to Deputy Director of the Office of Health Protection, and Brandy Lane, a white woman in her 30s, to Assistant Deputy Director for OPR. [79] ¶ 57; [95]

---

[7] IDPH asserts that that Little had to fill out a CMS form to apply for "a new position," [79] ¶ 15, and Little properly controverts that assertion. The record indicates that not every position was available via a CMS form; some high-level positions were appointed positions. [62-2] 96:12–97:14.

¶¶ 13–14, 17.[8] Matthew Ringenberg, a man, was offered a promotion that the department did not offer Little. [79] ¶ 60. IDPH promoted Charles to an upper-level position at the Division of Labs. [79] ¶ 63; [95] ¶ 17.

### F.    Little's Complaints of Discrimination and Retaliation

In 2007, Little filed an EEOC charge alleging discrimination based on race and sex, as well as retaliation. [95] ¶ 19. On September 1, 2015, Little filed a complaint with the state Office of Executive Inspector General complaining that IDPH employees were targeting and harassing African American employees. [95] ¶ 21. The OEIG responded on October 8, noting that it had referred the case back to IDPH to handle internally. [95] ¶ 21. A few months later, Little filed a complaint with the Attorney General's Office alleging discrimination based on race, sex, and age. [95] ¶ 23. On October 5, 2015, Little filed an EEOC charge alleging discrimination and retaliation on the basis of race, sex, and age. [79] ¶ 71; [95] ¶ 22. The EEOC mailed a right-to-sue letter on March 8, 2017, and Little brought this lawsuit. [79] ¶ 72.

## IV.    Analysis

In her second amended complaint, Little brings two Title VII claims based on her sex and race: a discrimination claim under a hostile-work-environment theory, and a retaliation claim. [23] at 3–6. She brings an ADEA claim based on failure to promote. However, in her brief opposing summary judgment, Little argues that the

---

[8] The department disputes that Lane and Lamb were promoted because Little lacks personal knowledge of those facts, but does not dispute that either Lamb or Lane received a promotion. The department included that Lamb and Lane were promoted in its own statement of facts. [79] ¶ 57.

department failed to promote her, subjected her to a hostile work environment, and retaliated against her based on her sex, race, and age.

A plaintiff "may not amend h[er] complaint" through arguments raised in her brief opposing summary judgment. *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) (quoting *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002)). But the Federal Rules of Civil Procedure "do not require a plaintiff to plead legal theories." *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 859 (7th Cir. 2017) (quoting *Vidimos, Inc. v. Laser Lab Ltd.*, 99 F.3d 217, 222 (7th Cir. 1996)). Thus, generally, district courts "should not hold plaintiffs to their earlier legal theories unless the changes unfairly harm the defendant." *Id.* A plaintiff proceeding on a new legal theory based on facts already alleged does not expose the defendant to any "unfair surprise." *Whitaker v. Milwaukee Cty.*, 772 F.3d 802, 808–09 (7th Cir. 2014). But plaintiffs "do have to raise factual allegations in their complaints." *Chessie*, 867 F.3d at 859. If a plaintiff changes her factual theory at the summary-judgment stage, a court could consider it an attempt to amend the complaint, and the plaintiff may forfeit the argument. *Id.* at 860.

Little's second amended complaint adequately alleged facts to put IDPH on notice that she was pursuing her discrimination claims on the basis of sex, age, and race. Hostile work environment and failure to promote are legal theories of discrimination, so it is permissible for Little to argue on summary judgment failure to promote based on race and sex, and hostile work environment based on age, so long as she does not change her factual theory. Her complaint includes facts alleging that

she was subjected to a hostile work environment and passed over for promotions that went to unqualified comparators. And her EEOC complaint states that she was discriminated against based on her race, sex, and age, as well as retaliated against for protected activity related to all three characteristics. [95-2] at 2–3. IDPH does not profess any undue surprise or prejudice at Little's factual theories in her response brief. Its brief treats all three factors interchangeably. Although Little's complaint seems to limit the failure-to-promote theory to her age-discrimination claim, the parties have briefed it as applied to all three protected characteristics. In sum, IDPH was on notice that Little based her discrimination and retaliation claims on all three characteristics, and her summary-judgment brief is not an improper amendment of her complaint.

## A. Discrimination (Prima Facie Method of Proof)

Title VII prohibits an employer from discriminating against an employee on the basis of race or sex. 42 U.S.C. § 2000e-2(a). The ADEA protects workers aged 40 and older from age-based employment discrimination. 29 U.S.C. §§ 621(b), 631(a). As in all employment-discrimination cases, the only question is whether a reasonable factfinder could find that Little was subjected to an adverse employment action based on a statutorily prohibited factor—here, race, sex, or age. *See Barnes v. Bd. of Trs. of Univ. of Ill.*, 946 F.3d 384, 389 (7th Cir. 2020); *McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 788 (7th Cir. 2019).

### 1. *Failure to Promote*

A plaintiff may prove discrimination either directly or indirectly, and may use both direct and circumstantial evidence. *McKinney v. Off. of Sheriff of Whitley Cty.*,

866 F.3d 803, 807 (7th Cir. 2017). Because evidence of discriminatory animus is often hard to come by, a plaintiff may rely on the burden-shifting method of proof described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Id.* Both parties here rely on the indirect method of proof.

To survive summary judgment on her claim using the indirect method, Little must establish a prima facie case of failure to promote. *Barnes*, 946 F.3d at 389; *Riley v. Elkhart Cmty. Schs.*, 829 F.3d 866, 891–92 (7th Cir. 2016). If she does so, the burden shifts to IDPH to produce a legitimate, nondiscriminatory reason for promoting someone else instead of Little. *Barnes*, 946 F.3d at 389; *Riley*, 829 F.3d at 892. The burden then shifts back to Little to produce evidence that IDPH's reason was pretextual. *Barnes*, 946 F.3d at 389; *Riley*, 829 F.3d at 892.

To state a prima facie case of failure to promote, Little must show that (1) she is a member of a protected class; (2) she was qualified for the position sought; (3) she was rejected for the position; and (4) someone outside the protected class who was not better qualified was hired instead. *Barnes*, 946 F.3d at 389.[9] If Little fails to establish any of those elements, IDPH is entitled to summary judgment. *Riley*, 829 F.3d at 892.

---

[9] IDPH argues that summary judgment is warranted on Little's discrimination claims because, as a threshold matter, Little has not argued that she suffered any materially adverse employment actions. [60] at 3–5. I disagree. Failure to promote can be an adverse employment action, and that is the adverse action that Little relies on to prove her discrimination claims under Title VII and the ADEA. [80] at 4. She relies on different adverse employment actions in her retaliation claim. In her discrimination and retaliation claims, I consider discrete acts as adverse employment actions. In the hostile-work-environment claim, discussed below, I consider the totality of the circumstances to assess the severity or adversity of Little's working conditions. *Boss v. Castro*, 816 F.3d 910, 918 (7th Cir. 2016).

The analysis for a failure-to-promote claim is the same under both Title VII and the ADEA. *Jordan v. City of Gary, Ind.*, 396 F.3d 825, 833 (7th Cir. 2005).[10]

Little identifies five coworkers who received (or were offered but declined) promotions to positions that Little says were unposted and for which she was better qualified. Swehla was asked to apply for a Senior Public Service Administrator position when she applied to be OPR Division Chief, but Little was never asked to apply for any Senior Public Service Administrator position. Swehla, who is white, had a master's degree, but no Ph.D. Matthew Ringenberg was offered, but declined, the positions of OPR Division Chief and Division Chief of a different department, the Office of Health Protection. Molly Lamb, a younger, white woman was promoted to Deputy Director of the Office of Health Protection, and Division Chief of the Office of Food, Drugs, and Dairy.[11] Brandy Lane, also a younger, white woman, was promoted to Assistant Division Chief and Division Chief in the Office of Food, Drugs, and Dairy. And Matthew Charles was promoted to Laboratory Director and Division Chief. Beyond those positions, Little lists several other positions that she says she was interested in and qualified for, both in OPR and in the Office of Health Protection,

---

[10] Title VII and ADEA claims are not always evaluated together, because mixed-motive claims are available under Title VII but not the ADEA; however, here, the parties treat them interchangeably, so I do not distinguish between the sex- and race-based claims and the age-based claim. *See Joll v. Valparaiso Cmty. Schs.*, No. 18-3630, 2020 WL 1316688, at *5 (7th Cir. Mar. 20, 2020).

[11] Little asserts that Lamb assaulted her (and nevertheless received a promotion); IDPH does not dispute that Little accused Lamb of assault, but disputes that any assault occurred because an internal investigation found insufficient evidence of intentional offensive conduct. [95] ¶ 15. This allegation is immaterial to Little's claims, so documents related to it remain sealed on the docket. [95].

including Chief of Staff, Director, Deputy Director, and Assistant Deputy Director of either office. [80] at 20–21, 23.[12]

Little cannot establish a prima facie case of failure to promote because she did not apply for almost any of those positions; she last applied for a promotion in 2012.[13] Generally, when a plaintiff has not applied for a position, she cannot prevail on a claim that she was discriminatorily passed over for that position. If she "never applied," the employer "could not have rejected her." *See Riley*, 829 F.3d at 892 (granting summary judgment for employer on failure-to-promote claim); *see also McCurry*, 942 F.3d at 789 (same, where plaintiff did not apply for the position); *Jaburek v. Foxx*, 813 F.3d 626, 632 (7th Cir. 2016) (same).

There are some exceptions. Little argues that every position she cites, other than the position she applied for in 2012, was not posted for anyone to apply to— select people were approached and asked to apply. [80] at 23. If an employer "hands out promotions on its own initiative in a nonselective, serial fashion," a plaintiff need not have applied for a position to establish a failure-to-promote claim. *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383–84 (7th Cir. 2016) (quoting *Loyd v. Phillips Bros., Inc.*, 25 F.3d 518, 523 (7th Cir. 1994)). The plaintiff need only show that, had

---

[12] Little included some of these facts to varying degrees in her 56.1 statement and introduced others for the first time in the brief. None of the new facts are dispositive, so I include them here for completeness, despite the technical rule violations.

[13] Little identifies one higher position to which she applied and was rejected: in either 2011 or 2012 she applied to be an Assistant Lab Manager, and Charles, a white man, got the job instead. [80] at 22. But Little testified that her application was not considered because she filled out the application incorrectly. [62-2] 96:14–18. I thus read Little's argument to take issue with Charles's later promotions, which she says were not posted, not the position she applied to in 2011 or 2012.

the employer approached her, she would have accepted. *Loyd v. Phillips Bros. Inc.*, 25 F.3d 518, 523 (7th Cir. 1994).

Another exception to the application requirement is if an employer accepts applications from anyone, but the employer's "discriminatory practices" deter an employee from applying. *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 738–39 (7th Cir. 2006) (quoting *Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 558 (7th Cir. 2003)); *see also Volling*, 840 F.3d at 384 (plaintiff need not have applied for the position at issue if plaintiff is "deterred from applying by the very discriminatory practices he is protesting" (quoting *Loyd*, 25 F.3d at 523)). And in *Volling*, the court found a hybrid of those two exceptions. The plaintiffs did not need to show that they had applied for positions where their employer only informed workers who had not complained of discrimination about open positions. *Id.* So the plaintiffs' failure to apply "stemmed from the very discriminatory practice they complain[ed] of." *Volling*, 840 F.3d at 384.

Little appears to argue both that she never applied for a promotion because the department secretly handed out promotions in a discriminatory manner, and also that the department's discriminatory practices deterred her from applying. These arguments undercut each other; if she was deterred from applying, Little would have had to have known about openings and chosen not to apply. In any event, neither exception works here. Little says she was deterred from applying for advanced positions because she noticed that the department had a pattern of firing African American employees in top leadership positions. But the exception to the application

requirement focuses on the promotion process, not on discriminatory practices that may influence later employment decisions, and evidentiary issues notwithstanding, Little's argument makes no sense. She essentially argues that she did not apply for any upper-level positions because she worried that if she did, and was promoted, she would then be fired. A reasonable jury could not find that IDPH's discriminatory policies deterred Little from applying for upper-level positions based on the illogical perception that the department would promote her, only to fire her. *See Riley*, 829 F.3d at 892 n.2 (requiring plaintiff to have applied for position where there was "no evidence that surreptitious [employer] action precluded [plaintiff] from applying").

That the department handed out some positions without posting them also does not enable Little to circumvent the application requirement. The record indicates that most positions were open to all employees, except for top leadership positions that were appointed. Swehla explained the protocol to receive a promotion as: "the positions would have to be posted," and anyone interested would then apply. [62-3] 94:6–11. Likewise, when asked how employees apply for new positions, Little testified that, "you fill out" a "CMS form," and, when a new position opened up, "you can be appointed into it or apply for it." [62-2] 96:12–18, 97:8–17. Swehla testified that, when she applied to be a Senior Public Service Administrator at OPR in 2015, the position was posted. [62-3] 40:14–41:18. Swehla added, "The postings are all consistent," and typically included a description of the open job and a due date. [62-3] 41:17, 43:4–9.

To be sure, both Swehla and Little testified that IDPH did not post some higher-level leadership jobs; specifically, in OPR, Deputy Director and Division Chief were appointed positions, so IDPH did not post openings for them. [62-2] 96:23–95:10, 251:23–252:6; [62-3] 43:7–12, 94:9–95:3. Swehla explained that top-level jobs were not posted because "the administration has the discretion to hire their … top leadership." [62-3] 43:10–12. Little likewise thought that appointed positions "[p]ossibly" might be positions filled at the pleasure of the governor. [62-2] 97:14. All positions in OPR other than Deputy Director and Division Chief were posted. [62-3] 94:9–95:3.[14]

Because most IDPH vacancies were widely distributed and accessible, Little's case is distinguishable from the situation in *Loyd*, and Little must show that she applied to the positions she claims she was implicitly rejected for. Only two positions in OPR were appointed, nonavailable positions—Deputy Director and Division Chief. And while Little says she was interested in those two jobs, she also lists positions like Assistant Division Chief, Assistant Deputy Director, and Lab Director, among others. The record permits an inference that those lower-level positions were made available, and Little presents no evidence that all of the positions were for appointed, upper-

---

[14] The denial of a promotion to certain jobs is not actionable, "if the position that the plaintiff seeks is not within Title VII's protective scope." *Sailsbery v. Vill. of Sauk.*, No. 15 C 10564, 2016 WL 4701446, at *3 (N.D. Ill. Sept. 8, 2016). Neither Title VII nor the ADEA protect "appointee[s] on the policymaking level." 29 U.S.C. § 630(f); 42 U.S.C. § 2000e(f); *Opp v. Off. of State's Att'y of Cook Cty.*, 630 F.3d 616, 619 (7th Cir. 2010). The record here is not sufficiently clear to determine whether positions such as Division Chief were appointed policymaking positions. And since I must draw all inferences in Little's favor, I assume that they were not. But IDPH may not have posted certain vacancies if the jobs were for appointed positions that served at the pleasure of the governor—a legitimate, nondiscriminatory reason not to post those openings.

level positions. The position that Swehla received, Senior Public Service Administrator, was posted. The appointed positions were the exception, not the rule. Moreover, Little does not dispute that Swehla testified there were no vacancies in their division, and that Little never indicated any interest in a higher position to Swehla, her direct supervisor. Thus, a reasonable jury could not find that Little was discriminatorily denied a promotion that she never expressed interest in and never applied for.

Little's claim fails for another reason. Even if she could overcome the application requirement, Little still must show that she was better qualified than the applicants who received the jobs that she sought. Little has not made that showing. First, she offers no evidence about what qualifications IDPH was seeking when it filled any of the jobs that Little alleges she was overlooked for. She lists a wide range of titles across three different offices within the department, and each of those positions presumably required different qualifications. Some appear to be management roles, while others, such as Lab Director, likely required more technical expertise. Without "knowing what qualifications the department sought" in any of those positions, "it is almost impossible to determine which candidate was more or less qualified." *Carter v. Chi. State Univ.*, 778 F.3d 651, 660–61 (7th Cir. 2015).

Along those lines, Little's insistence on her superior qualifications fails to establish that she was better qualified for any of those jobs. She relies almost exclusively on the fact that she has a Ph.D., while comparators did not. But she never explains why a Ph.D. in molecular biology makes her more qualified than anyone else

for any of the positions she lists. *See id.* at 660 (granting summary judgment for employer where plaintiff did not identify "what significance, if any" the employer "placed on degree credentials"). Likewise, she lists certifications she held, but does not concretely connect any certification to any specific position she was denied. Absent evidence about what qualifications any given role required, Little's "own opinions about her qualifications" do not create a material factual dispute. *Robertson*, 949 F.3d at 381 (quoting *Rabinovitz v. Pena*, 89 F.3d 482, 487 (7th Cir. 1996)).

Further, Little's claim fails because she has provided almost no information about the qualifications of the comparators she identifies. She notes that Ringenberg, Charles, Lane, and Lamb were all younger than she is and had less experience in public health, and that none of the alleged comparators had a Ph.D., although all but Lane had a master's degree. Little provides no details about when any of her coworkers' careers started, what type of experiences they had, or what qualifications they held. Without more information, Little cannot establish that she was better qualified. *See Ford v. Marion Cty. Sheriff's Off.*, 942 F.3d 839, 859 (7th Cir. 2019) (granting summary judgment for employer on failure-to-promote claim where plaintiff "did not present enough evidence about the jobs or how she compared to other candidates to support an inference of discrimination"); *See Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 897–98 (7th Cir. 2018) (same, where plaintiff offered no evidence of promoted employees' backgrounds, qualifications, or resumes).

Little has not marshaled a prima facie case of failure to promote, and the employer need not give a reason for not promoting her. Still, its explanation is facially

reasonable: Swehla testified that there were no vacancies for a higher position than Little's in OPR between July 2015 and March 2017, and Swehla did not see anyone in OPR receive a promotion during that time. If there were no vacancies in Little's department, she could not have been promoted. And the other jobs that Little expressed interest in were in other departments, headed by other supervisors. Little's claims primarily revolve around discrimination at the hands of Swehla and Rayman, but they both worked in OPR and presumably would not have been involved in promoting workers to jobs in other sections of IDPH.

Little did not apply for a promotion, was not rejected for one, and fails to show that she was better qualified than any of her coworkers who were promoted. Summary judgment is granted on Little's failure-to-promote claim.

### 2. *Hostile Work Environment*

A hostile work environment is one that is so "permeated with discriminatory intimidation, ridicule, and insult" that it alters the conditions of the victim's employment and creates an abusive working environment. *Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018) (quoting *Boss v. Castro*, 816 F.3d 910, 919–20 (7th Cir. 2016)). To survive summary judgment on her hostile-work-environment claim, Little must show: (1) she was subject to unwelcome harassment; (2) the harassment was based on a reason forbidden by Title VII or the ADEA (here, sex, race, and age); (3) the harassment was so severe or pervasive that it altered the conditions of employment and created a hostile or abusive working environment; and (4) there is a basis for employer liability. *Smith v. Ill. Dep't of Transp.*, 936 F.3d 554, 560 (7th Cir. 2019); *Abrego*, 907 F.3d at 1015. Courts considering hostile-work-environment

claims evaluate the totality of the circumstances, focusing on the frequency of the improper conduct, its severity, whether it was physically threatening or humiliating, and whether it unreasonably interfered with the employee's work performance. *Abrego*, 907 F.3d at 1015.

Little argues that a number of circumstances, taken together, created a hostile work environment, caused primarily by Swehla. She says Swehla oversaw her meetings and checked on her time logs; interfered with her work assignments by reassigning some of her duties to others; refused to conduct a yearly evaluation for her; and subjected her to unfounded disciplinary actions. Meanwhile, her other coworkers contributed to the atmosphere by dismissing her ideas, interrupting her, and putting her on hold during conference calls. She also cites the department's delay in reimbursing her for travel expenses. [80] at 4–5, 14, 17.

Little has not marshaled evidence from which a reasonable factfinder could find that she was subjected to intolerable working conditions. At the outset, Little fails to show that any action she describes was connected to a protected characteristic. She does not dispute that no supervisor ever commented on her sex, that Swehla never specifically commented on her age, and no one at the department ever directed a racial slur at her, either orally or in writing. Of course, the use of a slur is not a prerequisite to establishing a genuine dispute about a hostile work environment, and a plaintiff conceivably could survive summary judgment without such overt evidence of animus. But there must be "some connection" to Little's race, sex, or age. *Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1159 (7th Cir. 2014). That is, "not every

perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a racial minority." *Id.* (quoting *Beamon v. Marshall & Ilsley Tr. Co.*, 411 F.3d 854, 863–64 (7th Cir. 2005)). Thus, successful hostile-work-environment claims often include explicit verbal commentary to demonstrate the basis for and severity of the harassment. *See, e.g.*, *Robinson v. Perales*, 894 F.3d 818, 828 (7th Cir. 2018) (finding supervisor's "multiple uses" of a racial slur in combination with other actions created an issue of material fact about whether harassment was severe or pervasive); *Johnson*, 892 F.3d at 900 (same, based on supervisors' use of "racially derogatory speech"). And when an employee is subjected to, for example, "boorish," "inappropriate," "vulgar," or "race-tinged" comments, such statements are often not enough to create a factual dispute if they are not shown to be sufficiently severe or pervasive. *See Swyear v. Fare Foods Corp.*, 911 F.3d 874, 881 (7th Cir. 2018); *Poullard v. McDonald*, 829 F.3d 844, 859 (7th Cir. 2016). If a plaintiff subjected to explicit, albeit relatively mild, commentary about her race, sex, or age, cannot establish a hostile-work-environment claim, then Little cannot do so here, where she has presented no evidence that Swehla or anyone else targeted Little based on a protected characteristic. *See Abrego*, 907 F.3d at 1016 (granting summary judgment for employer where plaintiff "did not present sufficient evidence to permit a reasonable jury to find that the alleged harassment was based on his race or sex"); *Zayas*, 740 F.3d at 1159 (same, where allegations of harassment "lack[ed] any clear connection" to plaintiff's national origin).

In any event, a reasonable factfinder could not find that any of the actions Little labels harassment were race-, sex-, or age-based, because they were largely caused by Little's own actions. Little says unfounded disciplinary actions contributed to the hostile work environment, but she does not dispute that she committed the offenses underlying those actions: that she failed to report to a training, ignored Swehla's written directives to complete tasks by a certain date, committed timesheet violations, and engaged in unprofessional and disruptive conduct. She said in a TV interview that IDPH employees would "rape" and "hang" her if given the opportunity, resulting in a three-day suspension. And Little received a disciplinary reprimand for talking over her colleagues at meetings and during conference calls, and criticizing an IDPH training. The department reprimanded Little not because of her sex, race, or age, but because of her conduct. Further, Little primarily blames Swehla for creating a hostile work environment; she maintains that her working atmosphere deteriorated under the new reporting structure. But Swehla only issued the August 2016 written reprimand. The November 2016 reprimand and February 2017 suspension both came from Rawls, Little's former supervisor.

Nor could Swehla's heightened oversight and presence at meetings, or her delegation of some responsibilities away from Little, reasonably be considered race-, sex-, or age-based harassment. It is undisputed that Swehla believed Little was overwhelmed by her responsibilities—she often missed deadlines or conveyed information too late, causing others to miss deadlines. Swehla testified that Little

was involved in "tons of things," and she delegated some of Little's duties to others only "so that we would meet timely deadlines." [62-3] 92:3–10.

So too, multiple people present complained that Little was rude, disrespectful, and inappropriately critical at meetings. Little had made a poor impression in the past, not only on other department employees, but also on IDPH's federal counterpart at the CDC. Given that background, no reasonable factfinder could find that reasonable oversight amounted to intolerable working conditions, even when coupled with the other circumstances Little describes. *See Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016) (rejecting hostile-work-environment claim where interference with plaintiff's job was "reasonable: it stemmed from his own failure to meet legitimate employment expectations"); *see also Abrego*, 907 F.3d at 1015–16 (finding working conditions where supervisors were disrespectful and subjected plaintiff to excessive monitoring "not objectively offensive, severe, or pervasive"); *Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir. 2002) (finding plaintiff's claim that her supervisor was "rude," "ignored her work-related suggestions," and subjected her to "severe criticism" insufficient to establish hostile work environment).

Swehla's monitoring when Little swiped in and out of the office was similarly minor. It's not clear that Little even knew that Swehla was reviewing her swipes in and out. And it's unremarkable for a supervisor to monitor her employees' hours, as Little readily admitted. Certainly there's no evidence that Little felt physically intimidated, severely humiliated, or otherwise abused by Swehla taking an action that was entirely within the scope of her job duties. And that Swehla did not fill out

a performance evaluation for Little was likewise inconsequential. Swehla testified that she did not fill out a yearly evaluation for Little because, when Swehla started, Rawls had not filled out Little's evaluation from the year before, so Swehla could not complete the next one. [62-3] 80:20–81:5. Little identifies no harm she suffered from not receiving a yearly review. The same is true of any delay in receiving her travel reimbursements, especially because another employee, not Swehla, processed those requests.

The closest Little comes to establishing a hostile work environment is her allegation that her coworkers repeatedly insulted her by ignoring her ideas at meetings and preventing her from contributing. But while undoubtedly frustrating, Little's coworkers talking over her and preferencing other's ideas over hers at meetings was arguably not even offensive, let alone severe, humiliating, or threatening. Indeed, "[o]ffhand comments, isolated incidents, and simple teasing" do not alter the terms and conditions of employment. *Johnson*, 892 F.3d at 900 (quoting *Passananti v. Cook Cty.*, 689 F.3d 655, 667 (7th Cir. 2012)). And what Little describes falls short of even that. No one ever called her ideas terrible, and no one explicitly prohibited her from speaking at meetings. Title VII does not entitle an employee to respect or accolades from coworkers—it protects against an environment of severe ridicule and intimidation. Little was disciplined for talking over and criticizing colleagues at meetings, and she does not dispute that her coworkers found her argumentative and difficult to work with. Assuming her colleagues intentionally

limited Little's contributions at meetings, it is nevertheless unreasonable to infer that the conduct had anything to do with Little's race, sex, or age.

No reasonable factfinder could find that Swehla subjected Little to a hostile work environment. Many of the actions that Little labels harassment were justified responses to Little's own conduct that occurred in the normal course of a supervisor-supervisee relationship. And the other circumstances amount only to a series of unconnected, minor indignities, none of which related to her sex, race, or age. Summary judgment is granted to IDPH on Little's hostile-work-environment claim.

## B. Discrimination (Totality of the Evidence)

*McDonnell Douglas* is just one way of organizing evidence in an employment-discrimination case. *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 368 (7th Cir. 2019); *Abrego*, 907 F.3d at 1012. I must evaluate the evidence "as a whole" to determine whether Little suffered an adverse employment action because of her membership in a protected class. *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

Little has not suffered any adverse employment actions for the reasons already discussed above (and below in discussing Little's retaliation claim). But even if she had, a reasonable factfinder could not find that any action was because of Little's race, sex, or age. In discrimination cases, "the sole question that matters" is "causation, and thus intent." *Joll v. Valparaiso Cmty. Schs.*, No. 18-3630, 2020 WL 1316688, at *5 (7th Cir. Mar. 20, 2020). Little must present direct or circumstantial evidence to support an inference of intentional discrimination. *Id.*; *Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 563 (7th Cir. 2009). There are generally three

types of circumstantial evidence that will support an inference of intentional discrimination: "ambiguous or suggestive comments or conduct," "better treatment of people similarly situated but for the protected characteristic"; and "dishonest employer justifications for disparate treatment." *Joll*, 2020 WL 1316688, at *5.

Little has not offered any direct evidence of discriminatory intent. No one ever directed a racial slur at Little, or made any comment about her sex, age, or race that would suggest Little was not promoted, disciplined, monitored and so on based on one of those protected characteristics. That leaves her with circumstantial evidence. Drawing all inferences in Little's favor, I read Little's approach to this as two-fold: she argues that she was treated poorly as compared to similarly situated employees, and also that, historically, IDPH discriminated against African American employees (this argument appears to apply only to her race-discrimination claims).[15]

Similarly situated employees must be "directly comparable" to Little "in all material respects." *Barbera v. Pearson Educ.*, 906 F.3d 621, 629 (7th Cir. 2018) (quoting *Khowaja v. Sessions*, 893 F.3d 1010, 1015 (7th Cir. 2018)). An employee is similarly situated to a plaintiff if he "deal[s] with the same supervisor," is "subject to the same standards," and has "engaged in similar conduct." *Id.* (quoting *Lauth v. Covance, Inc.*, 863 F.3d 708, 716 (7th Cir. 2017)). Despite Little's repeated assertions that she was mistreated as compared to her colleagues who did not belong to a

---

[15] I disagree with IDPH that Little's argument is an attempt to amend the complaint to add an unexhausted disparate-impact claim. [94] at 8–9. A plaintiff may introduce evidence of a pattern of discrimination to show that the employer's justification is pretextual or as circumstantial evidence of intentional discrimination.

protected class, she identifies no one who engaged in similar conduct at IDPH and suffered different consequences. She argues that Joe Ramos was never in the office, yet was never disciplined. [80] at 9. But Little would not have any personal knowledge of Ramos's disciplinary history. And there's no proof that Ramos committed any of the same violations that Little did—Little's disciplinary actions covered missed deadlines, ignoring directives, insubordination, and disrespectful conduct, not failing to show up to the office.

She also contends that she did not have any full-time staff working under her, while other non-black employees did. [80] at 9. Little supervised interns, however, so IDPH did allow her some supervisory functions. She does not explain how the difference between supervising an intern and a full-time staff member would permit an inference of intentional discrimination. And it's not clear that the other IDPH employees who supervised staff were in the same position as Little. Finally, Little never asked Swehla to hire someone to help her, undercutting her claim that IDPH discriminatorily denied her a subordinate.

As evidence of race-based mistreatment, Little contends that Rayman and Swehla only monitored the swipe-ins, computer log-ins, and travel vouchers of African American employees, and, as a result of those investigations, IDPH laid off a number of workers at once, only rehired the white employees, and replaced the fired African American employees with new, white employees. [80] at 7–9, 21. Little's allegations on this front lack any support in the record; she would have no way of knowing whose log-ins Rayman was monitoring, and her belief that he was doing so

is based on hearsay—another employee told her that Rayman was monitoring only black employees. Likewise, her allegations about IDPH only rehiring white employees are not in her Rule 56.1 statement, and are cursorily presented in her response brief. As evidence to support her allegations, she cites only to her own unauthenticated exhibits in which she makes the same allegations. The argument is "perfunctory and undeveloped," and is waived. *Ripberger v. Corizon, Inc.*, 773 F.3d 871, 879 (7th Cir. 2014) (finding plaintiff waived argument that there was a "pattern" of discrimination by not developing factual record).

Evidentiary issues aside, these allegations cannot save Little's claims. Evidence of an employer's policy and practice can be "relevant evidence of pretext or discrimination," but the evidence must "undercut the specific justifications given by the employer." *Barnes*, 946 F.3d at 390 (quoting *Ford*, 942 F.3d at 858). Alleging a history of discrimination is typically "not enough to impugn a particular employment decision." *Ford*, 942 F.3d at 858.

Little's claims focus on discrimination by her supervisors, Swehla and Rayman. There is no indication that Swehla or Rayman were involved in the hiring and firing decisions Little mentions; Little offers no evidence about who made those decisions. Further, those incidents are unrelated to the harm that Little alleges. Little does not argue that *she* was terminated, let alone based on her race. *See Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 606 (7th Cir. 2012) (rejecting plaintiff's reliance on employer's "pattern of age discrimination" to show discriminatory intent because "nothing connects these employees' departures to prohibited conduct"). And

Rawls, the OPR Deputy Director, was African American, undermining Little's argument that IDPH historically discriminated against African American employees, so she was also discriminated against. *See Barnes*, 946 F.3d at 390 (rejecting plaintiff's argument that failure to promote was discriminatory based on employer's history of failing to promote African Americans where employer had promoted African Americans to head positions).

Finally, the department offered credible reasons for taking the actions it did. If an employer's explanations are "facially legitimate," a court accepts them as true unless there is some contradiction, inconsistency, or implausibility that suggests a factfinder could find the explanation incredible. *Robertson*, 949 F.3d at 381–82 (quoting *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008)). Little points to no contradiction or inconsistency in the explanations to allow a jury to infer that the reasons are dishonest.

Whether viewed through the *McDonnell Douglas* or *Ortiz* lens, Little has not offered evidence to permit a jury to conclude that IDPH discriminated against her on the basis of race, sex, or age.

## C.    Retaliation

Title VII and the ADEA provide that it is unlawful for an employer to discriminate against an employee because the employee filed a complaint about an unlawful employment practice. 42 U.S.C. § 2000e-3(a); 29 U.S.C. § 623(d). To survive summary judgment on her retaliation claim under either statute, Little must produce enough evidence for a reasonable jury to find that: (1) she engaged in a statutorily protected activity; (2) the department took a materially adverse action against her;

and (3) there was a but-for causal connection between the two. *Robertson*, 949 F.3d at 378; *Wetzel v. Glen St. Andrew Living Cmty., LLC*, 901 F.3d 856, 868 (7th Cir. 2018) (noting same test for Title VII and ADEA).

Statutorily protected activity is a "cognizable expression of opposition" to discriminatory practices. *Jaburek*, 813 at 633 (quoting *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 634 (7th Cir. 2011)). It must be "more than simply a complaint about some situation at work." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 718 (7th Cir. 2018) (quoting *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 901 (7th Cir. 2016)). And the complaint must indicate that discrimination occurred based on the complainant's membership in a protected class. *Id.* Filing an EEO complaint is "the most obvious form of statutorily protected activity." *Lewis v. Wilkie*, 909 F.3d 858, 867 (7th Cir. 2018) (quoting *Coleman v. Donahoe*, 667 F.3d 835, 859 (7th Cir. 2012)).

Little engaged in protected activity. Her claim revolves around a series of complaints that she filed in late 2015, including reporting race discrimination to the OEIG and the Attorney General's Office, and filing a complaint with the EEOC that alleged discrimination on the basis of sex, race, and age, and retaliation based on protected activity under both Title VII and the ADEA. [80] at 15–16.[16]

Little fails, however, to establish that she suffered any materially adverse action. The standard for a materially adverse employment action is lower in the

---

[16] Little also lists other examples of protected activity, such as text messages she sent to Damon Arnold, a department director, and a complaint she sent to state Representative Jehan Gordon. Those complaints are inadmissible for the reasons noted above, and I do not consider them. Even if considered, they would not change the outcome, as Little has established that she engaged in protected activity, and they would not advance her causation argument.

retaliation context than in the discrimination context. The action need not affect the terms and conditions of employment, but it must be one that would deter a reasonable employee from making a discrimination complaint. *Robertson*, 949 F.3d at 382; *Poullard*, 829 F.3d at 856. Still, Title VII protects an individual "not from all retaliation, but from retaliation that produces an injury or harm." *Lewis*, 909 F.3d at 868 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006)). Thus, a materially adverse action in the retaliation context typically affects the plaintiff's compensation, work hours, career prospects, or conditions of employment. *Robertson*, 949 F.3d at 382; *Poullard*, 829 F.3d at 856–57.

Little identifies three materially adverse actions she says she suffered as a result of her complaints: her 2015 reassignment and title change; the disciplinary actions she received, including a hearing in September 2015 that led to a suspension; and a hostile work environment. [80] at 17–18.

The 2015 reorganization was not a materially adverse action. IDPH switched Little's title and supervisor as part of a broader reorganization to bring OPR in line with a structure that central management had approved. Swehla testified that OPR reorganized because HR "was requiring the agency to follow their official organizational chart." [62-3] 49:19–25. It was not specific to Little, and affected multiple employees; Vassmer also reported to Swehla under the new structure. The change in title and supervisor did not correspond to a salary decrease or different job duties. No reasonable employee would be dissuaded from complaining about discrimination based on Little's inclusion in a department-wide reorganization.

Little's written reprimands were likewise not materially adverse. A written admonishment unaccompanied by any sanction does not register as the type of harm Title VII guards against. That is, "unfair reprimands or negative performance reviews" are not materially adverse actions for a retaliation claim unless accompanied by "tangible job consequences." *Robertson*, 949 F.3d at 383 (quoting *Boss*, 816 F.3d at 919); *Fields v. Bd. of Educ. of City of Chi.*, 928 F.3d 622, 626 (7th Cir. 2019) (finding "pre-meeting notices, which *warned* that discipline was possible," and "mediation, which resulted in *no* discipline" not adverse actions because they did not affect plaintiff's "career prospects or salary"); *Poullard*, 829 F.3d at 856–57 (letter of admonishment not an adverse action where plaintiff did not explain "what effect if any that letter had on his compensation, career prospects, or conditions of employment"). The only tangible harm Little points to that followed from those reprimands was a suspension following her TV appearance, which was objectively warranted based on Little's violation of IDPH's policies. Beyond that, none of the other disciplinary actions she received appear to have had any identifiable effect— Little does not dispute the department's characterization of them as "written reprimands." A reasonable employee would not be deterred from reporting discrimination based on Little's disciplinary actions, where those actions were justified and, for the most part, had no discernable consequences.

Finally, materially adverse actions in the retaliation context must be considered independently, not under the totality of the circumstances. *Lewis*, 909 F.3d at 868 n.3. So Little may not rely on a hostile work environment as an adverse

action for her retaliation claim, and, even if she could, she has not established a genuine dispute that she was subjected to a hostile working environment for the reasons discussed above. Even considering the actions Little includes as contributing to a hostile work environment independently, none are actions that would dissuade a reasonable employee from complaining about discrimination. For example, "The knowledge that supervisors are monitoring one's location while at work would not dissuade a reasonable employee from engaging in protected activity." *Lewis*, 909 F.3d at 869. Likewise, regarding Swehla's delegating responsibilities, "challenged actions involving the reassignment of job responsibilities are typically not materially adverse." *Robertson*, 949 F.3d at 382 (quoting *Stephens v. Erickson*, 569 F.3d 779, 791 (7th Cir. 2009)). Little makes no claim that she was paid hourly or suffered a reduction in compensation based on having less work to do because Swehla reassigned some of her duties. And a reasonable person in her position would not refrain from reporting discrimination simply because her supervisor skipped a yearly review. *See Lewis*, 909 F.3d at 868 (finding "isolated administrative errors" not materially adverse actions because they caused no "lasting harm or injury" and were "minor workplace grievances against which Title VII does not protect").

Even if Little had suffered a materially adverse action, she fails to link a protected activity to any harm she experienced. To prove causation, she must show that the "desire to retaliate was the but-for cause of the challenged action." *Robinson*, 894 F.3d at 830 (quoting *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1019 (7th Cir. 2016)). Relevant circumstantial evidence of a causal connection can include

"suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 924 (7th Cir. 2019) (quoting *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015)).

Little relies on temporal proximity between her complaints and the alleged adverse employment actions to establish a causal connection. [80] at 18. She filed a complaint with the OEIG on September 1, 2015, and wrote to the governor on September 8, 2015. On September 11, 2015, IDPH held a disciplinary hearing that resulted in Little's suspension the following November. So, Little says, the timing of her complaints in early September establishes that IDPH suspended her in November as retaliation for making those complaints.

The record casts doubt on Little's timeline. Little received notice of the hearing on September 4—before she wrote to the governor. Nor does Little's September 1 OEIG complaint establish suspicious timing. Nothing in the record indicates that the OEIG received her complaint and communicated it to Little's supervisors between September 1 and September 4. It took much longer for the OEIG to process and forward Little's complaint; the OEIG wrote back to Little on October 8 saying it had referred her complaint back to IDPH. So neither her disciplinary hearing nor her suspension could have been in retaliation for that complaint. Little fares no better with her assertion that she filed her EEOC complaint in October 2015, and the department suspended her in November. The department held the hearing that led

to that suspension in September, before Little made her EEOC complaint. *See Jaburek*, 813 F.3d at 634 (where adverse actions occurred before plaintiff filed EEO complaint, "timing doom[ed]" plaintiff's retaliation claim).[17]

Little also argues that her alleged abusive work environment was the result of "her subsequent Title VII complaints filed after October 5, 2015." [80] at 18. But she does not tie any specific complaint to any actionable harm. And many of Little's allegations are undated—it is not clear when Swehla began keeping track of her swipes in and out, or when Swehla transferred responsibilities. Because Little has alleged both recurring complaints and adverse actions in generalities, it is impossible to evaluate the suspicious timing that Little urges shows a retaliatory motive.

More broadly, a reasonable factfinder could not find that IDPH sanctioned Little as retaliation, because the department had legitimate, nonretaliatory reasons for nearly all of the actions Little takes issue with. As noted with regard to Little's hostile-work-environment claim, Swehla and Rayman disciplined her because of her conduct, not as backlash for complaining about discrimination. Proof of causation requires proof that the "unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Robinson*, 894 F.3d at 830 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013)). Little offers no evidence that the department would not have disciplined her for her behavior if

---

[17] The suspension could not have been retaliatory because it wasn't an adverse action—Little successfully appealed it. "'[A] suspension without pay that is never served does not constitute an adverse employment action' for retaliation purposes." *Poullard*, 829 F.3d at 856 (quoting *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1120 (7th Cir. 2009)).

she had not filed complaints about race discrimination. And other actions that Little takes issue with have similarly benign explanations. Little's title and supervisor changed in 2015 because IDPH conducted a wide-scale reorganization, and Swehla redistributed some of Little's job duties not as a reproach for Little's complaints of discrimination, but so that the office would meet deadlines on time.

Because Little did not suffer a materially adverse employment action, and in any event cannot tie any protected activity to any alleged consequence, Little has failed to establish retaliation.

## V.      Conclusion

At bottom, a reasonable factfinder could not find that Little suffered any adverse consequence for any reason other than legitimate concerns about the quality of her work and her conduct. IDPH's motion for summary judgment, [59], is granted. Enter judgment and terminate civil case.


ENTER:

Dated:  March 31, 2020

Manish S. Shah
United States District Judge